**BOYD CONSTRUCTION COMPANY,**
**Plaintiff-Appellee-Cross Appellant,**

v.

**T. L. JAMES & COMPANY, INC.,**
**Defendant-Appellant-Cross**
**Appellee.**

No. 72–1582.

United States Court of Appeals,
Fifth Circuit.

April 17, 1973.

William S. Stone, New Orleans, La., Dorrance Aultman, Hattiesburg, Miss., for defendant-appellant-cross appellee.

Vardaman S. Dunn, Jackson, Miss., for plaintiff-appellee-cross appellant.

Before AINSWORTH and GODBOLD, Circuit Judges, and RUBIN, District Judge.

AINSWORTH, Circuit Judge:

This diversity action stems from a dredging subcontract between plaintiff Boyd Construction Company and defendant T. L. James & Company, Inc. The District Judge decided that James delayed an unreasonable time in completing the subcontract and awarded damages to Boyd. The District Judge de-nied, as unsupported by the evidence, James's counterclaims (1) for additional *quantum meruit* compensation due to the difficulties of dredging the materials encountered and (2) for standby costs. James appeals from the award in favor of Boyd and from the denial of its counterclaims. Boyd cross-appeals and contends that the District Judge's award was inadequate. We affirm.

Boyd obtained the prime contract from the United States Corps of Engineers involving a channel on the Verdigris River near Tulsa, Oklahoma. This necessitated excavation of some 10,700,000 cubic yards at Boyd's bid price of 21 cents per cubic yard. Boyd's equipment proved inadequate to handle the last million cubic yards. After James assured Boyd that it could clear this remaining area in three months, Boyd hired James to bring in its dredge. As compensation, Boyd agreed to pay a price of 38 cents per cubic yard plus a lump sum of $27,700 for mobilization and demobilization of the dredging equipment. Additionally, Boyd agreed to pay "James $96.00 per hour for each and every hour of stand-by time which is caused as a result of being shut-down by or because of Boyd or its operation or by the owner, except where such shut-down is caused by James."

The central issue in this case revolves around the length of time taken by James to complete the work. On November 18, 1968, James began work. The work was not completed until July 19, 1969.

In the absence of a written contractual provision as to the time for completion, the law implies a reasonable time. *See generally* 1 A. Corbin, Corbin on Contracts § 96 (1963); 3 A. Corbin, Corbin on Contracts § 593 (1960); 1 W. Jaeger, Williston on Contracts § 38 (3d ed. 1957). The District Judge found that James continued for "a period of four months more than was reasonably required," thereby entitling Boyd to damages of $50,000.

■ In reviewing factual determinations, we do not retry the case. *See* Williams v. Nat'l Surety Corp., 5 Cir., 1958, 257 F.2d 771, 772–773. According to Rule 52(a), Federal Rules of Civil Procedure, "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." After reviewing the record we are not left with a definite and firm conviction that any mistake has been committed. *See* Chaney v. City of Galveston, 5 Cir., 1966, 368 F.2d 774, 776.

■ James's main contention is that the material dredged was different from that specified in the contract. According to the contract, "the material to be dredged shall consist primarily of sand, silt and some clay and shall not include the removal or dredging of any rock, boulders or other solid objects." Each day of the dredging James's field engineer estimated the composition of the dredged material. At the trial this data was summarized according to what was found during two separate periods:

|  | Sand | Gravel | Clay | Silt | Stone |
|---|---|---|---|---|---|
| November 18, 1968—<br>March 8, 1969 | 23.4 | 33.6 | 26.6 | 10.1 | 6.3 |
| March 8, 1969—<br>July 19, 1969 | 51.8 | 8.9 | 21.1 | 17.8 | 0.4 |

During the first period when 416,459 cubic yards were dredged, 60.1 per cent of the material was sand, silt, and clay, and during the second period when 695,706 cubic yards were dredged, 90.7 per cent was sand, silt, and clay. Accordingly, the composition met the contractual provision that the material would consist "primarily" of sand, silt, and clay. Clay accounted for only 26.6 per cent in the first period and 21.1 per cent in the second period, so it met the contractual limitation of "some" clay. Stone accounted for 6.3 per cent in the first period and 0.4 per cent in the second period, so there may be some doubt about this material. The District Judge was persuaded that the contract provision was only intended as assurance that the job would not abound in the removal of solid objects and that the quantity of stone dredged was no more than might be reasonably expected on such a project. We cannot say that this conclusion was clearly erroneous.

■ Gravel is not expressly mentioned in the contract, so the contract is ambiguous on the question whether it is a prohibited substance. The contract was drafted by James's counsel after a thorough inspection by its engineers at the site where the gravel was visible. The District Court properly found that Boyd did not misrepresent the nature of the work. Therefore, the contractual ambiguity should be construed against James. *See generally* 3 A. Corbin, Corbin on Contracts § 559 (1960); 4 W. Jaeger, Williston on Contracts § 621 (3d ed. 1961). Accordingly, the composition of the dredged material provides neither an excuse for James's delay nor a basis for James's counterclaim.

■ James further contends that it was entitled to standby time when it was allegedly ordered to wait until the water height in the river subsided before dredging the last "plug" of dirt. Though there is conflicting evidence on this point, there is adequate evidence in the record to support the District Judge's finding that James elected to wait for its own convenience so as to facilitate dismantling and loading its dredging equipment. Since the contract states that standby payments are not available when the delay was caused by James, this counterclaim was also properly denied.

There is no merit to James's concern over dredging some 100,000 cubic yards more than the 1,000,000 cubic yards specified in the contract. As the express language of the contract says, a million cubic yards was the minimum figure. "There shall be a minimum of one million cubic yards of dredging." Furthermore, he was paid at the contract price of 38 cents per cubic yard for the additional dredging.

The final question concerns the quantum of Boyd's damages for the delay of four months. Boyd's summary on appeal reflects expenses as follows:

| | |
|---|---|
| Four months payroll | $ 19,246.03 |
| Four months rent—dragline | 15,000.00 |
| Four months rent—Cat. D6 | 7,622.00 |
| Four months rent—Cat. D8 | 14,420.00 |
| Four months salary—Project Manager | 6,243.42 |
| Total payroll and rent | 62,531.45 |
| Add 10%—Overhead | 6,253.14 |
| Total Four Months Cost | $ 68,784.59 |

The District Judge disallowed the items pertaining to the 10 per cent overhead and the Project Manager's salary. Then he evidently rounded off the balance to $50,000. We cannot say this calculation was clearly erroneous.

Affirmed.