DELCO AIR CONDITIONING DIVI-
SION, GENERAL MOTORS COR-
PORATION, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 79–1547.

United States Court of Appeals,
Sixth Circuit.

Argued April 3, 1981.

Decided May 13, 1981.

Wendell R. Tucker and Otis M. Smith, Gen. Counsel, Detroit, Mich., for petitioner.

Elliott Moore, Deputy Associate Gen. Counsel, Barbara Franklin, N. L. R. B., Washington, D. C., Emil Farkas, Director, Region 9, N. L. R. B., Cincinnati, Ohio, for respondent.

Before WEICK and BOYCE F. MARTIN, Jr., Circuit Judges, and PHILLIPS, Senior Circuit Judge.

PHILLIPS, Senior Circuit Judge.

This case is before the court on the petition of Delco Air Conditioning Division, General Motors Corporation (the company) to review and set aside an order of the National Labor Relations Board, and the cross-application of the Board for enforcement of its order. For a recitation of the pertinent facts, reference is made to the decision and order of the Board reported at 24 N.L.R.B. No. 65.

The Board found that the Company violated § 8(a)(3) and (1) of the Act by discharging Robert L. Mullins because of his union activities, and violated § 8(a)(1) of the Act by conditioning an offer to reinstate Mullins upon his resigning as a Union Committeeman. The Board ordered the Company to offer Mullins immediate and full reinstatement with backpay to his former position or to a substantially equivalent position.

Upon consideration of the briefs, oral argument and the entire record, we conclude that the decision of the Board is not supported by substantial evidence on the record considered as a whole, and set aside the Board's order and deny enforcement.

The evidence was heard by Administrative Law Judge Benjamin K. Blackburn, who died September 2, 1978, after the close of the hearing and before rendering a decision. Administrative Law Judge Thomas A. Ricci prepared a decision based upon the record. The Board adopted ALJ Ricci's credibility findings, concluding that an independent examination of the record disclosed no basis for reversing his determination or findings of fact based thereon.

The Company's employees were represented by Local 801, International Union of Electrical, Radio and Machine Workers, AFL–CIO–CLC. At the time of his discharge, Mullins was a District Committeeman of the Union on the first shift. The Company contends that Mullins was discharged for just causes unrelated to Union activities.

The collective bargaining agreement recognized that it was the responsibility of management to maintain discipline and efficiency and the right of management to discipline and discharge employees for just cause. The record contains ample evidence of grounds for discharging Mullins. His Labor Relations Supervisor, Robert Burke, testified that during Mullins' approximately 19 months as an employee of the Company, he amassed the worst record of absenteeism and tardiness ever seen by Burke. The record contains considerable testimony as to misconduct on the part of Mullins.

For example, Mullins was discharged in 1976 for falsification of a travel card, but was reinstated in the settlement of a grievance. Burke testified that Mullins later admitted that he had falsified the time entry on the card. In September 1977 Plant Superintendent George Zeller accused Mullins of lying and cheating the Company, docked him for an hour's pay for his fraudulent attempt to receive compensation for time spent away from the plant and warned him that if he ever again was caught attempting to receive pay for time spent improperly out of the plant, he would be discharged.

The discharge involved in the current proceeding grew out of an incident on October 24, 1977. The Administrative Law Judge found that Mullins left the plant at 10 a. m., without signing out, in violation of Company rules. After his return Mullins was handed a written disciplinary notice reading "indefinite suspension", which later was changed to a straight discharge.

Five other employees of the plant had been discharged for engaging in similar fraudulent acts. A 1971 arbitration decision supported the discharge of a Union Committeeman for fraudulent collection of pay from the Company for time spent in conducting Union business outside the plant for which he received pay from the Union.[1]

■ It is the opinion of the court that substantial evidence on the record as a whole does not support the Board's conclusion that Mullins was discharged for Union activities. A more difficult question is presented as to whether the Company offered to reinstate him if he would resign as Union Committeeman.

The Administrative Law Judge credited Mullins' testimony that the Company's Labor Relations supervisor, Burke, proposed in a telephone conversation that the Company would withdraw all records of discipline from Mullins' file and reinstate him if Mullins would resign as Union Committeeman. Mullins' testimony on this point, which is uncorroborated by any other evidence in the record, was as follows:

> During your first conversation with Mr. Burke that morning was there anything else that you can recall that Mr. Burke said to you as to making any suggestions to you with regard to your reinstatement?
>
> A. During the conversation, at the point where we were discussing the reprimand and the two weeks on my record, I said I couldn't live with that. Burke stated that upon my resignation as Com-

1. The five page text of this arbitration decision, rendered March 19, 1971, appears in the appendix at pp. 532a–536a.

mitteeman that he would pull the two weeks.

Q. What did you reply to that?

A. I was to think about it, which I did. My reply to it was negative.

Mullins filed a grievance for his discharge. On November 11, 1977, Mullins telephoned Labor Relations Supervisor Burke and asked him if there was any way to settle his case. Burke testified he informed Mullins that, since there was an open grievance, he could not deal directly with Mullins; that Mullins stated he realized Burke could deal only with his Shop Committeeman with respect to the grievance, but nevertheless wanted to discuss settlement possibilities off the record; and that Burke agreed to talk with Mullins' Committeeman and "get back with" Mullins later "with the understanding that any conversation between Mr. Mullins and myself were only discussions and not formal proposals to settle the case."

Burke testified further that Mullins insisted that, in the event he was reinstated by settlement of the grievance, no record of discipline be placed in his record. The testimony of Burke includes the following:

Q. Okay. Did he have a response to that?

A. We talked about that for a couple of moments. He state that—let me think of exactly what he did say. He was still somewhat opposed to the three days being on his record. He stated at that time that as long as he was a committeeman he wasn't worried about the three days. He said but I'm thinking about getting out of this whole business. I said well would you explain what you mean? He said well I am thinking about resigning as a district committeeman and going to the third shift. I said, Bob, I have no idea of what your intent is to resign or anything else but it doesn't have any bearing on this case. He told me at that time that he felt that if he went to the third shift with a three day on his record the first time he messed up he'd be living with a week out and he couldn't live with that. He wasn't worried about it as long

as he was a committeeman but if he went to the third he didn't want that hanging over his head. I said, Bob, if that is the only thing from keeping us from settling this case on all the conditions said above then I would consider cancelling that discipline if and when you went to the third shift.

Q. Okay. What was his response to that?

A. Mr. Mullins said we have no problem, call me back to work.

Q. Okay, and what did you say?

A. I said, Mr. Mullins, I cannot call you back to work. I have already told you I have to deal with your shop committeeman. I suggested that Mr. Mullins contact Mr. Miller and relate to him the discussions we had just had and have Mr. Miller get with me and when we set down and we both understood the terms of that agreement then I would call him back to work. Mr. Mullins stated that he would like to think about the whole thing for a while before he made a final decision and he talked about he really didn't think Mr. Miller would agree with the time equalization split. He would rather handle that on his own. I told him that due to some prior dealings that I had had with Mr. Miller it was imperative that I have the entire settlement in writing. Again he told me he would like to think it over. I said okay fine think it over and give me a call back.

Q. Okay. Did you receive a call back?

A. About 30 minutes later Mr. Mullins called me back.

Q. Okay, and what was said?

A. He told me that he did not feel that he could convince Mr. Miller to agree to the equalization split and he didn't think that he should have the three day disciplinary layoff put on his record at all.

Q. Anything else said?

A. I told him that if that was the way he felt there was really no reason to continue this discussion and he agreed. I told him that I would contact Mr. Miller his shop committeeman and make him an offer along the same lines that we'd just

talked about. He said that's fine, if Miller buys it that's okay with me.

Q. Okay, and did you subsequently have a conversation with Mr. Miller?

A. Yes, sir, I did. And I made him the formal proposal.

Q. Okay. Which proposal did you make to Mr. Miller?

A. To cancel the discharge and return to work without any compensation; place a three day disciplinary layoff on his record for violating shop rule 6; cancel the three day at the appeal step without any compensation; split the time equalization groups effective January 3rd.

Q. Was that the entire proposal that was made?

A. To the best of my knowledge, yes it was.

Q. *Was there any insistence on your part that Mr. Mullins resign as a committeeman?*

A. *Absolutely not.*

Q. What was Mr. Miller's response?

A. Mr. Miller said he would talk with Mr. Mullins and he came back I believe the following day and rejected the offer and the offer was withdrawn at that time.

Q. The offer was withdrawn by you?

A. Yes, sir. (Emphasis added.)

If the Board was correct in its factual conclusion that the Company offered reinstatement to Mullins upon the condition that he resign his position as Union Committeeman, the Company violated § 8(a)(1) of the Act; *Associated Truck Lines, Inc. v. NLRB*, 644 F.2d 884, 106 LRRM 2242 (1981); *Cameron Iron Works, Inc. v. N. L. R. B.*, 464 F.2d 609 (5th Cir. 1972).

■ However, the court concludes that this finding of fact by the Board is not supported by substantial evidence on the record considered as a whole. *Universal Camera Corp. v. N. L. R. B.*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *N. L. R. B. v. Elias Brothers Big Boy, Inc.*, 327 F.2d 421 (6th Cir. 1964). *See also N. L. R. B. v. Otsego Ski Club-Hidden Valley, Inc.*, 542 F.2d 18 (6th Cir. 1976); *Metropolitan Life*

*Insurance Co. v. N. L. R. B.* 371 F.2d 573, 582 (6th Cir. 1967); *N. L. R. B. v. Barberton Plastics Products, Inc.*, 354 F.2d 66, 69 (6th Cir. 1965); *N. L. R. B. v. Mt. Vernon Telephone Corp.*, 352 F.2d 977, 979 (6th Cir. 1965).

■ Although credibility determinations ordinarily are the prerogative of the Board, this court is unwilling to enforce a backpay award upon the uncorroborated testimony of Mullins who would be the beneficiary of reinstatement and the backpay award. *See Elias Brothers Big Boy, supra,* 327 F.2d at 427.

Significantly Administrative Law Judge Blackburn, who heard the testimony, made this statement at the close of the hearing regarding the credibility of Mullins' testimony on another issue:

I would suggest and no matter how you structure your briefs in the beginning on all of these issues on credibility and what time he actually left the plant and so forth, my present feeling is that my finding of fact is going to be in the Respondent's favor, that he did leave the plant at 10:10 and did not come back until 12:06. Let me say why I think that at the moment because I want to preserve it for later on to see if it still seems like such a good reason to me when I write the decision. The thing that impresses me the most in this area is the existence of R–4 and R–5. R–4 is the Irregular Hours Pass with the time out, time in on it. Coupled with the testimony of Mr. Kester yesterday which frankly I found quite persuasive, taking the two together at the moment I think I'm persuaded that I'm going to find against Mr. Mullins on the question of when he left the plant.

Administrative Law Judge Ricci, who inherited the case, also credited the Company's version of the facts on this issue and concluded that Mullins was not telling the truth when he denied leaving the plant while the guard's back was turned. Nevertheless, Administrative Law Judge Ricci credited the uncorroborated testimony of Mullins that he was offered reinstatement upon the condition that he resign as Union Committeeman.

The order of the Board is set aside and enforcement is denied.

The costs of the proceedings in this court are taxed against the National Labor Relations Board.